# United States Court of Appeals
## For the First Circuit

No. 01-2270

FRANCES A. BABCOCK, IN HER CAPACITY AS EXECUTRIX
OF THE ESTATE OF PAUL A. BABCOCK, III, AND INDIVIDUALLY,

Plaintiff, Appellee,

v.

GENERAL MOTORS CORPORATION,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Lipez, Circuit Judge,
Campbell and Bownes, Senior Circuit Judges.

Daniel L. Goldberg, with whom S. Elaine McChesney, Donald J. Savery, Bingham Dana LLP, Thomas J. Sweeney, Daniel B. McLane, and Eckert Seamans Cherin & Mellott, LLC, were on brief, for appellant.

Edward M. Kaplan, with whom Robert M. Larsen, Timothy A. Gudas, and Sulloway & Hollis, P.L.L.C., were on brief for appellee.

August 12, 2002

**BOWNES, <u>Senior Circuit Judge</u>**.  This appeal is taken by defendant-appellant General Motors Corporation ("GM") from an adverse jury verdict in favor of plaintiff-appellee Frances A. Babcock as executrix of the estate of Paul A. Babcock, III, and individually.  The case arose from an accident on February 21, 1998, when a General Motors pickup truck driven by Paul A. Babcock, III, went off the road and struck a tree.  The accident rendered Babcock a paraplegic.  On June 15, 1999, Babcock died as a result of complications from his injuries.

## I.  <u>BACKGROUND</u>

Plaintiff brought suit alleging negligence and strict liability against the defendant.  The jury returned a verdict finding GM liable on the negligence count and not liable on the strict liability count.  It is undisputed that when Babcock was first seen after the accident his seat belt was not fastened around him.  The complaint alleged that Babcock was wearing his seat belt prior to the accident, but that the belt unbuckled as soon as pressure was exerted on it and the buckle released due to a condition known as "false latching."  The main focus of the trial was on this claim of false latching.

Three main issues are before us:  (1) whether the verdict should be set aside because it was internally inconsistent; (2) whether GM forfeited its objection to the alleged inconsistency because of its failure to follow the requirements of Rules 49(b)

-2-

and 51 of the Federal Rules of Civil Procedure as applied by this court; and (3) whether the evidence was sufficient to support the verdict of liability based on negligence.  We affirm the judgment below.

## II.  DISCUSSION

### A.  The Claim of Inconsistent Verdicts

GM advances a series of arguments to the effect that the jury's verdict on the negligence count is invalid and cannot stand: (1) as a matter of law, in the absence of a defect in the product, GM could not be found liable for negligence; (2) thus, the verdicts were inconsistent; (3) the inconsistency in the verdicts was caused by the district court's erroneous jury instructions; and (4) plaintiff's failure to appeal the verdict in favor of GM on the strict liability claim precludes entry of judgment for plaintiff on the negligence claim and mandates entry of judgment for GM.

None of these arguments or variations thereof was made in the trial court.  During the discussions on the proposed jury charge, the trial judge discussed the Verdict Form with counsel on two separate occasions.  GM did not object to the form on either occasion.  The Verdict Form on liability submitted to the jury

stated:

SPECIAL VERDICT FORM

1. Has plaintiff proved her negligence claim by a preponderance of the evidence?

   X         
Yes                    No

2. Has plaintiff proved her product liability claim by a preponderance of the evidence?

         X   
Yes                    No

_____[Answer questions 3 and 4 only if you have answered yes to question 1 and/or 2]

Although the Verdict Form is entitled "Special Verdict Form," it seems clear that it was not a true "special verdict," as described in Rule 49(a) of the Federal Rules of Civil Procedure. Rule 49(a) states: "The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact." Here, for example, a special verdict form would have included questions such as whether Babcock was wearing his seatbelt at the time of the accident. When such a form is used, the jury makes only findings of fact; it is up to the court to apply the law. See 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2503, at 155-56 (2d ed. 1994). It seems clear that this is not the type of verdict form used in this case.

Rule 49(b), which addresses general verdicts, states: "The court may submit to the jury, together with appropriate forms

-4-

for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict." This is the type of form used in this case: the jury returned a verdict against GM, and also answered specific interrogatories designed to channel its deliberations, focusing its attention on the crucial issues that it had to resolve in order to decide which party should prevail.[1] See Wright & Miller, supra, § 2511, at 217 & n.1 (discussing the purpose of Rule 49(b)). The last sentence of Rule 49(b) specifically discusses inconsistent answers to questions submitted to the jury: "When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial."

We have held that under Rule 49(b), objections to the inconsistency of verdicts must be made after the verdict is read and before the jury is discharged. E.g., Merchant v. Ruhle, 740 F.2d 86, 89 (1st Cir. 1984); Skillin v. Kimball, 643 F.2d 19, 19-20 (1st Cir. 1981). Consistent with those precedents, we hold that GM

---

[1] In the alternative, the jury's answers to the questions on the verdict form could be described as two general verdicts. See Merchant v. Ruhle, 740 F.2d 86, 88-89 (1st Cir. 1984). We need not determine which label is correct because the result is the same regardless. As we explain below, objections to allegedly inconsistent special interrogatories must be raised before the jury is discharged. The same is true for allegedly inconsistent general verdicts. See id. at 91-92.

forfeited its objection to the alleged inconsistency by failing to object at the critical time. See McIsaac v. Didriksen Fishing Corp., 809 F.2d 129, 134 (1st Cir. 1987). To decide otherwise would countenance 'agreeable acquiescence to perceivable error as a weapon of appellate advocacy.'" Id. (quoting Merchant, 740 F.2d at 92). Consequently, unless there is plain error, we cannot grant relief on GM's claim that the jury's inconsistent liability findings rendered invalid its finding that GM was negligent. We address the issue of plain error below.

Our finding of forfeiture is reinforced by GM's failure to object properly to the jury instructions, which made clear that the jury could return a verdict in Babcock's favor if it found either negligence or a design defect. Cf. Toucet v. Maritime Overseas Corp., 991 F.2d 5, 9 (1st Cir. 1993) (noting that defendant "should have been alerted to the potential inconsistency by the jury instructions," which stated that the plaintiff could recover if on "one or both" of her negligence and unseaworthiness claims). Rule 51 of the Federal Rules of Civil Procedure provides in pertinent part: "no party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." We point out that during the pre-charge conference on the proposed jury instructions, the district court alerted counsel that in order to

preserve objections to the charge they had to object as required under the rule. Rule 51 has been stringently enforced to the extent that a district court judge cannot waive it even with the acquiescence of counsel. Poulin v. Greer, 18 F.3d 979, 982 (1st Cir. 1994); Smith v. Mass. Inst. of Tech., 877 F.2d 1106, 1109 (1st Cir. 1989); McGrath v. Spirito, 733 F.2d 967, 969 (1st Cir. 1984) ("[Rule 51] is binding on both the court and attorneys and neither can circumvent it."). And, of critical importance to GM's position, a failure to object as required by Rule 51 deprives the non-objecting party of review under Rule 61, either before the trial court on a post-trial motion or on appeal. Scarfo v. Cabletron Sys., Inc., 54 F.3d 931, 941 (1st Cir. 1995).

There is nothing in the record from which it can be found either directly or inferentially that GM objected to the submission to the jury of both the negligence and strict liability claims. In fact, defense counsel treated the submission of both claims as routine procedure. GM's only objection after argument and prior to the jury's retiring for deliberations was as follows:

> COUNSEL FOR GM: I just want to reiterate the comments that we had before that the court prepared the charge on the issue of defective design versus testing.
>
> THE COURT: All right. That your argument is that this does not include a negligence testing claim, and . . . you've adequately preserved that argument.

Evidently, the district court understood GM to be arguing (as it had during an earlier conference) that Babcock's claim of negligent testing was not properly in the case because it was not included in the Amended Complaint. Nothing in GM's post-charge comments raised the claim of possible verdict inconsistency it presses on appeal. We conclude that those brief comments did not satisfy the requirements of Rule 51.

The only exception to nullification of appellate issues for failure to follow Rule 51 is the plain error doctrine. Smith v. Kmart Corp., 177 F.3d 19, 28-29 (1st Cir. 1999). Reversal under that doctrine requires that (1) there be error; (2) the error was "plain" (i.e. obvious and clear under current law); (3) the error affected substantial rights; and (4) the error threatened a miscarriage of justice. Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 15 (1st Cir. 1999). We have applied the plain error doctrine "stringently" in civil cases. Id. Accordingly, we will grant relief on an issue that has been forfeited on appeal only "to prevent a clear miscarriage of justice . . . or where the error seriously affected the fairness, integrity or public reputation of judicial proceedings." Romano v. U-Haul Int'l, 233 F.3d 655, 664 (1st Cir. 2000) (citations and internal quotation marks omitted). We might find plain error where "'the failure to raise the claim below deprived the reviewing court of helpful factfinding; . . . the issue is one of constitutional

magnitude; . . . the omitted argument is highly persuasive; . . . the opponent would suffer special prejudice; . . . and, perhaps most importantly, . . . the issue is of great importance to the public.'" Id. (quoting Play Time, Inc. v. LDDS Metromedia Communications, Inc., 123 F.3d 23, 30 n.8 (1st Cir. 1997) (alterations in original). None of these factors is present in this case.

We examine New Hampshire law to determine whether there was plain error below. If New Hampshire law forbade combining a count in negligence with a count in strict liability in a tort case, the plain error doctrine might be applicable. But New Hampshire law does not prohibit submitting both negligence and strict liability claims to the jury. See, e.g., Cyr v. J.I. Case Co., 652 A.2d 685, 693 (N.H. 1995); Thibault v. Sears, Roebuck & Co., 395 A.2d 843, 849 (N.H. 1978); Greenland v. Ford Motor Co., Inc., 347 A.2d 159, 163 (N.H. 1975). The most that can be said is that submission of both claims is frowned upon. Thibault, 395 A.2d at 849 ("While . . . both counts are permitted, we do not recommend to plaintiffs that counts in both negligence and strict liability be submitted to the jury because of the confusion which is created."); see also Greenland, 347 A.2d at 163. We will not create a general rule of prohibition in light of the New Hampshire Supreme Court's reluctance to do so. We rule that it was not plain

error to submit counts in both negligence and strict liability to the jury.

The same is true for GM's claim that the verdict is internally inconsistent and its related argument that the jury's finding of negligence is invalid as a matter of law in light of its determination that there was no design defect. Both claims are based on the premise that a design defect is an essential element of negligence under New Hampshire law. We need not determine whether that proposition is correct -- it is enough to conclude, as we do, that New Hampshire law is not so clear on the question that it was plain error for the district court to enter judgment on the jury's verdict. See Stancill v. McKenzie Tank Lines, Inc., 497 F.2d 529, 535 (5th Cir. 1974) ("Confronted with no objection to the verdict or answers, it was not plain error for the district court to enter judgment upon the verdict as it did."). In denying GM's motions for a new trial and judgment as a matter of law, the district court clearly and thoughtfully explained:

> I deny the motion and offer the following comments in addition to the explanations I gave when I made the rulings to which General Motors objects: (1) General Motors was represented by highly skilled counsel and it was apparent to me that counsel understood at the final pretrial conference and throughout the trial that the plaintiff was asserting a claim for negligent testing; (2) General Motors has waived any claim that the special verdict form was unacceptable by failing to object at a time when I could have taken corrective action; and (3) General Motors has waived any claim that the verdicts are

-10-

> inconsistent because I gave it an opportunity to assert such a claim before I discharged the jury and it declined to make its argument at a time when I could have taken corrective action. I determine that oral argument on the motion is unnecessary because the issues have been well briefed. Motion denied.

We agree with the district court and affirm its denial of the motions.

### B.  **The Evidence**

GM argues that there was an absence of evidence that Babcock was wearing his seat belt at the time of the accident. It points out that no one saw a seat belt on him immediately after the accident. GM also argues that although Babcock himself was covered with blood and blood was on the interior of the cab of the truck, no blood was on the seat belt straps.

Plaintiff did not challenge these facts, but claimed that she would prove by habit or custom evidence that Babcock always wore a seat belt when he drove a motor vehicle. The district court ruled that such evidence would be allowed and that the question of whether Babcock was wearing a seat belt at the time of the accident was for the jury. GM objected to this ruling. At the time of the court's ruling, GM offered no case law to support its position and its brief cites no cases holding that habit or custom evidence could not be used to prove seat belt use under the facts of this case. It is well-established that habit evidence may be used to prove a person's conduct on a particular occasion: "Evidence of

the habit of a person . . . whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person . . . on a particular occasion was in conformity with the habit . . . ." Fed. R. Evid. 406; see also United States v. Newman, 982 F.2d 665, 668 (1st Cir. 1992).[2]

We recount testimony by three of the plaintiff's witnesses, all of whom described Babcock's habitual seat belt use. Ernest Babcock, brother of the decedent, testified that he drove with his brother, Paul Babcock, at least ten to twenty times a year from 1972 to 1998. George Clausen, Paul Babcock's neighbor, had known him for about a year and a half prior to the accident and had ridden with him about a dozen times. Judith Hobbs Jackson had known Babcock since the two were children. She had ridden with him eight to twelve times over the last several years, most of these times with Babcock as the driver. All three witnesses testified that Babcock always wore his seat belt, regardless of whether he was the driver or a passenger and regardless of the length of the trip. Jackson also testified that Babcock always put on his seat belt before the vehicle in which he was riding started.

---

[2] In contrasting habit evidence with character evidence, the Editorial Explanatory Comment to Rule 406 provides an example of a person's habitual seat belt use as more probative evidence that the person was wearing a seat belt on a particular occasion than evidence that the person is generally a safety-oriented person. Fed. R. Evid. § 406.02, cmt.

We rule that the district court did not err in submitting to the jury the question of whether Babcock was wearing his seat belt immediately prior to the impact of the truck with the tree. We also note that GM did not object to the jury instructions on this issue as required under Rule 51 of the Federal Rules of Civil Procedure.

GM also objects to the evidence with respect to the testimony of plaintiff's expert, Dr. Malcolm Newman. GM attacks the testimony on the ground that its admission violated the principles established in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (D.C. Cir. 1993).

In Daubert the Court rejected the rule stated in Frye v. United States, 293 F. 1013, 1014 (1923), that "expert opinion based on a scientific technique is inadmissible unless the technique is 'generally accepted' as reliable in the relevant scientific community." Daubert 509 U.S. at 584 (citation omitted). The Court put the responsibility for the admission or exclusion of scientific or expert evidence on the trial judge:

> That the Frye test was displaced by the Rules of Evidence does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. Nor is the trial judge disabled from screening such evidence. To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.

The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify. "*If scientific*, technical, or other specialized *knowledge will assist the trier of fact* to understand the evidence or to determine a fact in issue" an expert "may testify *thereto*."

Id. at 589 (emphasis in original) (footnote omitted). The Court further stated:

Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

Id. at 592-93 (footnotes omitted).

The penultimate paragraph summarizes the holding of Daubert:

To summarize: "General acceptance" is not a necessary precondition to the admissibility of scientific evidence under the Federal Rules of Evidence, but the Rules of Evidence-especially Rule 702-do assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands.

Id. at 597.

-14-

It is apparent to us that the expert's testimony met the standards set forth in <u>Daubert</u>. The evidence admitted was both relevant and reliable. The district court followed Rule 104(a) of the Federal Rules of Evidence and determined that the expert's testimony would assist the trier of fact in understanding or determining the facts in issue. <u>Id.</u> at 592. And under Rule 702 the district court ensured that the expert's testimony rested on a reliable foundation and was relevant to the task at hand.

We rehearse the testimony of Dr. Malcolm Newman, plaintiff's expert. Dr. Newman specializes in structural and mechanical engineering and has a Ph.D. from New York University. He provides consultation to clients mainly on matters involving litigation. From 1971 to 1975 he was a tenured full professor at Tel Aviv University in Israel. He is a certified diplomate of the American Board of Forensic Examiners and has authored sixty-five articles in his field. He has been greatly involved in the analysis of restraint systems in automobiles.

Based on photos and other materials given to him, Dr. Newman formed an opinion as to how fast the Babcock vehicle was traveling when it hit the tree. He explained to the jury, using the photos and other materials furnished to him, the analysis he followed to determine the speed at time of impact. Dr. Newman testified that the technology he used to determine the "impact speed" is one accepted by all recognized accident reconstruction

specialists and that the methodology he followed was accepted by the National Highway Traffic Safety Administration. In Dr. Newman's opinion, the "impact" speed was between twenty and twenty-five miles per hour. He also was of the opinion that the Babcock truck was traveling at a speed of between thirty-five and forty miles per hour when it left the highway. Dr. Newman also explained to the jury how he arrived at this estimate.

In Dr. Newman's opinion, at an impact speed of twenty-five miles per hour, a properly belted occupant would be fully protected by the seat belt. Dr. Newman opined that Babcock was either not wearing a seat belt or the seat belt was defective. From examining the seat belt itself, Dr. Newman concluded that it had been used just prior to impact.

Using the seat belt found in the cab of the truck, Dr. Newman explained to the jury his opinion as to how the seat belt disengaged upon impact. He eliminated a manufacturing defect and "inertial release"[3] as causes for the unbuckling of the seat belt. He testified that in his opinion, the seat belt unbuckled because of false latching, otherwise known as "partial engagement."

With the aid of photos, the accident seat belt, and another similar seat belt, Dr. Newman demonstrated how false latching can occur. In false latching the occupant thinks that the

---

[3] Inertial release is prompted by sudden changes in acceleration or deceleration and might cause a belt to unlatch in an accident.

belt is fully latched but in reality, it is not. Moreover, according to Dr. Newman, both falsely latched and fully latched seat belts trigger the same signals in the vehicle as to whether the seat belt is in use.

Dr. Newman characterized a false latch propensity as a design defect. He used a schematic drawing to explain in detail all of the latch mechanisms in a safety belt buckle. Dr. Newman testified that because of the design of a GM belt buckle, continued use of the buckle increases the danger of false latching. Using a Volvo seat belt buckle, he demonstrated that its design eliminated the risk that false latching would occur. He noted that the buckle on the GM truck was tested pursuant to section 209 of the Federal Motor Vehicle Safety Standards.

Dr. Newman testified about the testing safety belt buckles must undergo. He concluded that the GM buckle could develop false latching due to normal wear and tear. He was of the opinion that there was no testing for false latching. Dr. Newman concluded his direct testimony by opining that the probable cause of the lack of seat belt restraint on Babcock after the accident was false latching.

Dr. Newman's testimony could be found by the jury to be relevant and reliable. We hold that the trial court did not err by allowing the jury to hear it.

The other arguments made by appellant do not merit discussion.

**The judgment below is affirmed.**  **Costs on appeal awarded to plaintiff.**