# United States Court of Appeals
## For the First Circuit

Nos. 09-1555
09-1556
09-2349

INTERNATIONAL FLOOR CRAFTS, INC.,

Plaintiff, Appellee/Cross-Appellant,

v.

JANE DZIEMIT,

Defendant, Appellant/Cross-Appellee,

DAVID W. ADAMS; TYRONE WILLIAMS; KEVIN BRITTO; RONALD E.
MITCHELL, Individually and d/b/a Mansfield Rug Company, a/k/a
Mansfield Rug Department, a/k/a Remco; MICHAEL E. BROWN,
Individually and d/b/a Dalton Padding, d/b/a Empire Weavers;
AGATHA ESPOSITO; DONALD SHOOP; CHINESE CARPET CENTER, INC., d/b/a
CCC International; JOHN D. SUN; DAVID D. SUN; PAUL SUN,

Defendants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Nathaniel M. Gorton, U.S. District Judge]

---

Before
Torruella, Stahl and Howard,
Circuit Judges.

---

Isaac H. Peres for appellant/cross-appellee Dziemit.
Paul J. Klehm, with whom Benjamin L. Falkner and Krasnoo
Klehm LLP were on brief, for appellee/cross-appellant
International Floor Crafts, Inc.

---

April 21, 2011

---

**STAHL**, **Circuit Judge**.  This trio of related appeals arises from a 2005 civil action brought by International Floor Crafts, Inc. ("IFC") for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and various Massachusetts state laws after IFC discovered a multi-million dollar fraudulent scheme being perpetrated against it by numerous individuals and entities.  By mid-2008, only two defendants remained in the suit — David Adams, a former employee of IFC, and Jane Dziemit, an outside business woman.  After a joint five-day trial, the jury returned a verdict against both Adams and Dziemit.

There are three appellate issues before the court, which involve only Dziemit and IFC.[1]  Dziemit argues that the denial of her motion for judgment as a matter of law was in error and that the district court's jury instruction on common law fraud was incorrect.  IFC cross-appeals with respect to one state law claim it brought under the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A ("Chapter 93A"), on which the district court refused to enter judgment.  Lastly, Dziemit separately appeals the district court's imposition of an appeal bond for $10,000.  For the following reasons, we affirm the district court's judgment against Dziemit and its imposition of the bond, and, at IFC's request, we decline to rule on the Chapter 93A claim.

---

[1]Adams did not appeal the jury verdict.

## I. Background

We recite the facts in the light most favorable to the jury verdict. Anaya-Burgos v. Lasalvia-Prisco, 607 F.3d 269, 270 n.1 (1st Cir. 2010). Building 19, Inc. ("Building 19") is a company that operates fourteen retail discount stores throughout the New England area selling a wide variety of consumer products. IFC manages the rug department of Building 19, and it is responsible for supplying Building 19's flooring inventory, which consists mostly of surplus and salvage oriental rugs, indoor and outdoor rugs, remnants, padding, and wood flooring.

Because the scheme at issue involved the exploitation of IFC's business practices, we summarize briefly IFC's procedures for buying and selling rugs. Typically, IFC buyers negotiate with outside vendors to purchase merchandise for retail sale. Upon placing an order with a vendor, the IFC buyer creates a purchase order detailing the product bought, the price of the product, and the outside vendor's information. The buyer then provides copies of this purchase order to the vendor, an IFC warehouse, and IFC's accounts payable department.

After receiving a copy of the purchase order, the vendor sends IFC an invoice and delivers the goods to the IFC warehouse. An IFC receiver accepts the product, and a supervisor at the warehouse completes a receiving document termed a "key-rec." The key-rec details the merchandise received, and the supervisor is

-3-

required to initial the document after having verified the contents of the delivery. Once the key-rec is complete, it is sent to IFC's accounts payable department. The accounts payable department cross-checks the corresponding purchase order, invoice, and key-rec. If personnel see no discrepancies in the paperwork, an accounts payable manager issues payment to the vendor.

## A. The Scheme

Starting sometime in the mid-1990s and lasting until April 2005, Adams and co-conspirator Kevin Britto devised and managed a fraudulent scheme that duped IFC into paying out millions of dollars to various vendors based on fabricated invoices. As IFC buyers,[2] Adams and Britto prepared purchase orders for partially or completely fake merchandise shipments, recording on the orders an exaggerated amount of items purchased. Britto communicated these fake purchases to Tyrone Williams, another IFC employee and the supervisor of IFC's largest warehouse. Williams, in turn, completed fraudulent key-recs to match the fraudulent purchase orders.

Various outside vendors were brought into the scheme, and some of these vendors were sham operations. These outside vendors

---

[2]Britto worked for IFC from July 1988 to November 1997, and again from September 1998 to September 2001. He continued to receive money from the scheme even after he left IFC. Adams was initially an outside vendor who did business with IFC, but IFC later hired him as a buyer. Adams was terminated from IFC sometime in 2005, which precipitated the discovery of the fraud.

would send invoices to IFC that matched the phony purchase orders and key-recs, allowing the scheme to continue undetected by the accounts payable department. Adams directed the vendors to charge a specific amount on its invoices, and when IFC's accounts payable department issued a check based on that amount, the vendors would distribute approximately seventy-five percent of the ill-gotten gains to Adams, keeping the remainder for themselves.

Chinese Carpet Center, Inc. ("CCC") was the primary vendor that colluded with Adams and Britto. David Sun, CCC's former treasurer, testified at trial about the company's knowing participation, and he detailed the scheme's inner-workings. He explained that CCC was consistently required to advance to Adams large sums of money via cash, check, and wire transfers. In turn, CCC would bill IFC for short or nonexistent shipments. When CCC received payment from IFC, it was paid back the initially loaned amount along with a profit, which was shared between CCC and Adams. Sun explained that this loan system kept CCC in the scheme and made it difficult to disengage, lest CCC not recoup the money it had advanced.

## B. Dziemit's Role and the Evidence Against Her

Prior to her involvement in the scheme, Dziemit worked as a mortgage lender associated with various companies, many of which were owned and operated by her boyfriend, Tony Maresca. Dziemit's primary activity was the completion of loan paperwork for the

companies, and she worked out of her home in Connecticut. At times, Dziemit would also make loans to third parties, drawing upon Maresca's mortgage companies or her own personal accounts to supply the funds. Each time Dziemit completed a loan, she executed a mortgage and a promissory note, and she profited from the loan based on the interest that it accrued.

Maresca was a long-time friend of Ronald Mitchell. Mitchell owned and operated a carpet underlay supply business known as Remco, and later, as Mansfield Rug, which sold padding. At some point in his career, Mitchell, doing business as Remco, sold padding to retail operations that he obtained from legitimate businesses. His company had no employees other than himself. In 1999 or 2000, Dziemit began working with Mitchell as part of Remco,[3] and she became a partner of the company for a few years. Around this time, Dziemit and Mitchell, along with Maresca, met with Adams at a Building 19 store to initiate a business relationship.

Mitchell and Dziemit testified at trial about their dealings with Adams and the transactions that were involved. According to their testimony, Adams would communicate to Mitchell a specific amount of money that Mitchell, d/b/a Remco, was to lend

---

[3]Evidence at trial also demonstrated that Dziemit was involved with Mansfield Rug, a successor in name to Remco, to the extent that she received at least two checks from the Mansfield Rug bank account.

to Adams, purportedly so that Adams could purchase rugs.  Then, Adams would send Mitchell an IFC purchase order that included a description of product ostensibly being supplied by Remco and the amount that Remco was to charge IFC on an eventual invoice.  The invoice amount was always greater than the loan amount, and the two figures in no way corresponded.  Mitchell would then fax the purchase order to Dziemit and communicate to her the amount of the loan to Adams.

Dziemit, acting in her lending capacity, would lend to Mitchell the money to be advanced to Adams.  Except for the first loan executed, Dziemit did not secure any notes or mortgages evidencing or securing these loans.[4]  Then, switching hats and acting as a Remco partner, Dziemit would advance the money to Adams, or at times, to Britto.  Many of these advances were completed via wire transfers.  Although Mitchell and Dziemit claimed that Adams used this advanced money to buy the merchandise that was listed on the purchase order and that was ostensibly being supplied by Remco, neither of them ever saw any product that was bought or shipped, and they never sought to visit a warehouse.

---

[4]At one point in January 2001, Mitchell, not Dziemit, obtained a mortgage on Adams' property.  Dziemit claimed to have an assignment on the mortgage, but she never produced this during discovery or at trial.  Even if Dziemit had a mortgage on Adams' property, she did not have one on Mitchell's property, even though the money she lent went to Mitchell, doing business as Remco.

Beyond the purchase order, there was no documentation that the product existed.

Approximately two or three weeks after Dziemit advanced money to Adams, Adams would alert Remco to submit an invoice to IFC. Dziemit drafted the bulk of the invoices and either she or Mitchell would mail them. Upon receipt of the invoice, IFC would send a check to Dziemit's post office box, or, at least one time, directly to Dziemit's home. Dziemit would endorse the check from IFC and deposit it into the account from which she initially borrowed the funds, which could have been her personal account or the account of one of Maresca's companies; Dziemit did not keep good records, and many of the transactions were recorded as handwritten notations on various papers. Dziemit would then send Adams a portion of the profit and share the remainder with Mitchell. At no time throughout her involvement was Dziemit ever actually engaged in the sale of padding, Remco's purported business.

When Dziemit testified at trial, she walked the jury through a sample transaction, using a $25,000 loan she made to Mitchell and then advanced to Adams on November 18, 1999. On January 19, 2000, approximately two months later, Dziemit received an invoice payment from IFC for $41,550.04. She deposited that amount into one of her mortgage accounts, wired just over $10,000 to Adams as his share of the profit, and split the remainder of the

gains with Mitchell. Dziemit personally profited $2915.28 from this loan. She agreed that this transaction indicated what would have been a 66 percent interest rate on an annual basis for the $25,000 loan, much more than what she would have earned on a typical secured mortgage loan.[5]

Sometime in late 2001, Dziemit ceased being a partner in Remco. She did, however, continue to loan funds to Mitchell, and these loans, along with a profit, were repaid to her. She also received money both during the time she was a partner and later, through 2003, even when she did not advance any funds. In total, Dziemit completed approximately 35 transactions for Remco, and each transaction took less than an hour. She estimated that for these 35 hours of work, she made approximately $130,000.

Dziemit admitted at trial that these transactions were a departure from her normal course of business. Dziemit had never before lent money to one of her business partners, nor had she ever lent money without receiving security. Dziemit estimated that she advanced a total of approximately $1.4 million to Mitchell for the transactions. Apparently, of the total amount lent, she had security for only $40,000. Further, never before in her business did Dziemit earn money from a loan based on a profit, rather than

---

[5]As explained to the jury, Dziemit's payment represented approximately 11 percent of the loaned $25,000, which, extrapolated to a yearly rate, demonstrated that Dziemit would have made 66 percent on the loan.

-9-

on the accrued interest.  Indeed, in all of her previous lending activities, Dziemit knew the percentage she would earn on a loan, but with respect to the loans to Mitchell, she did not know how much she would earn on a particular loan at the time she made the advance.  Additionally, there was no relationship between the amount Dziemit advanced and the ultimate profit that she earned.

**C.  The Discovery of the Fraud and the Subsequent Suit**

In March 2005, IFC terminated Adams for poor performance. The buyer hired to replace Adams began to notice various discrepancies between purchases Adams allegedly made and the product available for retail sale.  After delving through records, the new buyer contacted Mitchell about several missing deliveries ostensibly from Mansfield Rug.  Mitchell, trying to stave off any inquiries into the transactions, forwarded a fake bill of lading that he created with the help of Britto.  He also misled the buyer into believing that he had a warehouse full of goods and that other documents related to any deliveries were destroyed and therefore unavailable for verification.  Around this time, IFC's accounts payable department performed an internal investigation, which ultimately uncovered the scheme.  The department determined that it had paid almost $10 million in fraudulent invoices from Remco, Mansfield Rug, and CCC.

On August 10, 2005, IFC brought suit against Adams, Britto, Williams, CCC and its officers, Mitchell, and Dziemit,

among many others, for violations of RICO and Massachusetts state law.  In 2006, it settled with CCC and its officers and employees.  In 2007, it filed a suggestion of apparent death as to Britto, who had been suffering from a grave liver disease.  Prior to Britto's death, IFC videotaped his deposition, wherein Britto confessed to the scheme, implicated Adams and Williams, and denied the knowing involvement of Dziemit and Mitchell.  In 2008, an agreement for judgment was entered against Mitchell for over $3 million, and default judgment was entered against Williams.  By July 21, 2008, only Dziemit and Adams remained to stand trial for the following claims: (1) violations of RICO; (2) conspiracy to violate RICO; (3) common law fraud; and (4) as to Adams only, breach of fiduciary duty.  The district court reserved for itself IFC's Chapter 93A claim against Dziemit and Adams.

On July 29, 2009, the district court charged the jury, and the following day, the jury returned its verdict.  It found both Adams and Dziemit liable to IFC for violations of RICO and common law fraud.  It further found Adams, but not Dziemit, to have engaged in conspiracy to violate RICO, and it found Adams liable for breach of fiduciary duty.  The jury awarded IFC $5 million in damages against Adams, and $250,000 against Dziemit.  Pursuant to the RICO statute, the district court trebled these damages and awarded IFC $522,281 in costs, including attorneys' fees.

A flurry of post-trial motions ensued, only some of which are relevant for present purposes. IFC moved for entry of judgment against Adams and Dziemit on the Chapter 93A count. The district court denied the motion in an electronic order issued that same day, stating, "Because full damages were determined by the jury and trebled by the Court pursuant to 18 U.S.C. § 1964(c), the Chapter 93A claim is rendered duplicative and redundant and plaintiff's motion is denied." IFC sought reconsideration, which the district court also denied.

Thereafter, Dziemit renewed her motion for judgment as a matter of law, for which she initially moved at the close of IFC's case-in-chief and at the close of trial, arguing that there was insufficient evidence to find that she knowingly and willfully engaged in any fraud, or was willfully blind to the scheme. The district court denied this motion as well.

In her subsequent appeal, Dziemit now argues that IFC failed to present sufficient evidence to establish that she knowingly and willfully committed two or more acts of mail and/or wire fraud, rendering the RICO and common law fraud verdicts void. She also argues that the district court erred in providing the jury with a "willful blindness" instruction as to the common law fraud claim, and, to the extent that the instruction was proper, there was still insufficient evidence to prove that she was willfully blind.

IFC cross-appealed. It argues that although the district court was correct to reserve the Chapter 93A claim for itself, the court erroneously denied IFC's motion for judgment on the claim because IFC presented sufficient evidence to support it.

Lastly, Dziemit appeals the district court's order that she post an appeal bond that includes attorneys' fees as "costs on appeal." IFC sought a bond pursuant to Federal Rule of Appellate Procedure 7, after Dziemit filed her notice of appeal, to ensure payment of its appellate costs, including attorneys' fees. The district court granted IFC's motion and required Dziemit to post a bond for $10,000, of which $5000 was meant to cover appellate fees.

Because we find that IFC presented sufficient evidence to support the jury's verdict that Dziemit violated RICO and committed common law fraud, and because we find no plain error in the district court's jury instructions, we affirm the judgment against Dziemit. Because we affirm the judgment against Dziemit, we decline to rule on IFC's Chapter 93A claim at IFC's request. Lastly, we affirm the issuance of the appeal bond and hold that an appeal bond may include appellate attorneys' fees if the applicable statute underlying the litigation contains a fee-shifting provision that accounts for such fees in its definition of recoverable costs and the appellee is eligible to recover them.

## II. Analysis

## A.  Dziemit's Appeal in Relation to the Jury Trial and Verdict

We review de novo a district court's denial of a renewed motion for judgment as a matter of law. Alvarado-Santos v. Dep't of Health, 619 F.3d 126, 132 (1st Cir. 2010). Under such circumstances, we examine the evidence "in the light most favorable to the verdict and may reverse only if no reasonable person could have reached the conclusion arrived at by the jury." Id. (citing Valentín-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 95-96 (1st Cir. 2006). The court's review "is weighted toward preservation of the jury verdict," Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36, 41 (1st Cir. 2002), which will stand "'unless the evidence was 'so strongly and overwhelmingly' inconsistent with the verdicts that no reasonable jury could have returned them,'" id. (quoting Walton v. Nalco Chem. Co., 272 F.3d 13, 23 (1st Cir. 2001)).

### 1. RICO

To succeed on a civil RICO claim under 18 U.S.C. § 1962(c), a plaintiff must prove: "'(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity.'" Kenda Corp. v. Pot O' Gold Money Leagues, Inc., 329 F.3d 216, 233 (1st Cir. 2003) (quoting Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)). "By statute, the 'pattern' element requires a plaintiff to show at least two predicate acts of 'racketeering

-14-

activity,' which is defined to include violations of specified federal laws, such as the mail and wire fraud statutes." Id. (quoting Efron v. Embassy Suites (P.R.) Inc., 223 F.3d 12, 15 (1st Cir. 2000)) (internal quotations marks omitted); see also 18 U.S.C. § 1961(1), (5). Mail or wire fraud requires proof of: (1) a scheme to defraud, (2) knowing and willful participation in the scheme with the intent to defraud, and (3) the use of the mails or interstate wire in furtherance of the scheme. Bonilla v. Volvo Car Corp., 150 F.3d 62, 66 (1st Cir. 1998).

Dziemit does not challenge that IFC proved the existence of a scheme to defraud or that Dziemit used the mails or interstate wire in furtherance of the scheme. She argues only that IFC failed to prove that she knowingly and willfully committed mail or wire fraud, asserting that she was a peripheral participant and unaware of her complicity. She states that the lack of direct evidence attesting to her knowledge coupled with her own exculpatory testimony and that of Britto demonstrates that a reasonable juror could not have found her liable under RICO.

We reject Dziemit's contention. A review of the evidence in the light most favorable to IFC demonstrates that IFC presented sufficient evidence for a jury to conclude by a preponderance of the evidence that Dziemit knowingly and willfully participated in defrauding IFC. First, the jury heard testimony from Mitchell and David Sun from which it could infer Dziemit's knowledge. Mitchell,

-15-

Dziemit's partner, admitted that he agreed to a judgment against himself and that he lied to IFC in an attempt to stave off inquiries into his companies' dealings. David Sun admitted to CCC's complicity and described in terms strikingly similar to Dziemit that it was required to advance large sums of money to Adams via wire transfers and checks, and that it would make a profit on these advances once IFC paid its invoices.

Second, the evidence demonstrated that Dziemit was involved from the start in the transactions between Remco and Adams. Dziemit, along with Mitchell and Maresca, met Adams at a Building 19 store to initiate their dealings, and she continued to conduct transactions with Adams for approximately three years.

Third, Dziemit, a Remco partner purportedly in the business of selling rug padding, advanced large sums of money to Adams, a buyer of rug products. Further, she acknowledged that she never saw a Remco warehouse or any product it allegedly sold. Although she drafted and sent invoices to IFC, she never had any verification, apart from Adams' word as told to her through Mitchell, that any rugs were being delivered to IFC.

Fourth, and perhaps most significant, Dziemit admitted to the unusual nature of her profits and her dealings with Adams and Mitchell. Dziemit advanced money to Mitchell, her business partner, and then, in turn, advanced that money to Adams, the ostensible buyer, often through wire transfers or checks. She lent

this money from and deposited money back into various accounts, including both business and personal accounts, and she kept haphazard records. Dziemit advanced a total of approximately $1.4 million to Mitchell but had only $40,000 secured. She earned money not from the interest rate of the loans she provided, but from a profit realized upon charging IFC an amount that had no relation to the initial loan. Were these profits interpreted as earned interest, they would be considerably higher than any typical interest rate earned on a mortgage. In total, Dziemit was paid $130,000 for approximately 35 hours of work, less than a typical workweek. She was compensated even when she was no longer a partner and even when she did not advance any money.

This evidence, when viewed in the aggregate, was sufficient for the jury to conclude that Dziemit knowingly committed two or more acts of mail or wire fraud. See Bourjaily v. United States, 483 U.S. 171, 179-80 (1987) ("[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it."). To be sure, Dziemit's and Britto's testimony claimed, unsurprisingly, that Dziemit did not knowingly engage in the scheme, but the abundant circumstantial evidence at trial permitted the jury to make a contrary inference. See United States v. Boylan, 898 F.2d 230, 242 (1st Cir. 1990) (noting that a party may "'prove its case through the use of circumstantial evidence so long as the total evidence, including reasonable

-17-

inferences, is sufficient to warrant a jury to conclude that the defendant is guilty'" (quoting United States v. Campa, 679 F.2d 1006, 1010 (1st Cir. 1982))).

In support of her argument, Dziemit contends for the first time on appeal that the evidence regarding her knowing and willful participation in the scheme is further undermined by the jury's verdict, which did not find her liable for conspiring to violate RICO. She asserts that if the jury did not find her to have knowingly joined a conspiracy, then it could not have found her to have knowingly and willfully committed fraud.

This argument is a dead end. "Objections to the inconsistency of verdicts must be made after the verdict is read and before the jury is discharged." Babcock v. Gen. Motors Corp., 299 F.3d 60, 63 (1st Cir. 2002); see also Kenda, 329 F.3d at 223 n.4. Failure to object timely renders the claim waived or forfeited and, at most, subject to only plain error review. Babcock, 299 F.3d at 63-64 (applying plain error review to unpreserved inconsistent verdict claim deemed forfeited); see also Uphoff Figueroa v. Alejandro, 597 F.3d 423, 435 n.15 (1st Cir. 2010) (finding inconsistent verdict claim waived and afforded no review because party failed to object before jury was dismissed); Wennik v. PolyGram Grp. Distrib., Inc., 304 F.3d 123, 130 (1st Cir. 2002) (finding inconsistent verdict claim waived and, at most, entitled to plain error review).

Here, even if we apply the plain error standard, Dziemit's claim fails. Under plain error review, we reverse only if (1) there is an error, (2) that was obvious and clear under current law, (3) that affected substantial rights, and (4) that threatened a miscarriage of justice. Babcock, 299 F.3d at 64-65. Plain error is strictly applied in civil cases, and we will grant relief "only to prevent a clear miscarriage of justice or where the error seriously affected the fairness, integrity or public reputation of judicial proceedings." Id. at 65 (quoting Romano v. U-Haul Int'l, 233 F.3d 655, 664 (1st Cir. 2000)) (internal marks omitted). Dziemit does not even attempt to demonstrate how her claim meets this standard, nor do we see how it could.

### 2. Common Law Fraud

Dziemit next argues that IFC failed to present sufficient evidence to support its common law fraud claim. To prove fraud under Massachusetts law, a plaintiff must show that "the defendant 'made a false representation of material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff reasonably relied upon the representation as true and acted upon it to his damage.'" Taylor v. Am. Chemistry Council, 576 F.3d 16, 31 (1st Cir. 2009) (quoting Russell v. Cooley Dickinson Hosp., Inc., 772 N.E.2d 1054, 1066 (Mass. 2002)). At trial, the district court instructed the jury that it could infer Dziemit's knowledge from circumstantial evidence or, as to the

-19-

fraud claim only, from evidence that showed willful blindness. Under a willful blindness formulation, the defendant does not need to actually know that the statements she made were false if the falsity is "susceptible of actual knowledge."  See Kozdras v. Land/Vest Props., Inc., 413 N.E.2d 1105, 1111 (Mass. 1980).

IFC's theory of the case was that Dziemit was liable for fraud for the same reason that she was liable under RICO, because she knowingly submitted false invoices to IFC.  In turn, Dziemit asserts on appeal that IFC's evidence was inadequate to sustain its fraud claim for the same reasons she stated in challenging the RICO judgment, that is, that the evidence against her did not demonstrate that she actually knew that the invoices she sent to IFC were fraudulent.  Further, she claims that, to the extent that the court properly instructed the jury that knowledge as to common law fraud could be proved by willful blindness (which she contests on appeal), the evidence did not indicate that she was willfully blind to her fraud since not even IFC was able to discover the scheme until almost ten years after it began.

Dziemit's challenge to the fraud claim unravels in view of our conclusion that the evidence at trial reasonably supported a finding of RICO liability.  As we explained in our determination of Dziemit's RICO argument, a jury could have reasonably inferred from the circumstantial evidence that Dziemit actually knew that the invoices she mailed to IFC were fraudulent.  This alone is

-20-

sufficient to sustain the fraud claim, as the jury needed to find only actual knowledge or willful blindness to deem Dziemit liable for fraud.

### 3. **Willful Blindness Instruction**

Dziemit claims that the district court erred in supplying the jury with a willful blindness instruction for the common law fraud claim.[6] She argues, first, and with no citation to case law, that the instruction is improper in the civil context and instead is reserved solely for criminal matters. Second, parroting her sufficiency of the evidence argument, she contends that even if the instruction was not in error as a matter of law, it was improper in this case because there was not "'record evidence reveal[ing] 'flags' of suspicion that, uninvestigated, suggest willful blindness.'" See United States v. Epstein, 426 F.3d 431, 440 (1st Cir. 2005) (quoting United States v. Coviello, 225 F.3d 54, 70 (1st Cir. 2000)).

---

[6]The relevant portion of the common law fraud instruction was as follows:

> [T]he defendant then under consideration is liable if he or she made a false statement of fact knowing it to be false. You may infer such knowledge from circumstantial evidence or from evidence showing willful blindness of that person. If you find that a person had a strong suspicion but shut his or her eyes for fear of what he or she might learn, you may conclude that that person acted knowingly.

-21-

Dziemit raises this issue for the first time on appeal, and so we review only for plain error.[7]   See Fed. R. Civ. P. 51(d)(2); Ji v. Bose Corp., 626 F.3d 116, 125 (1st Cir. 2010). Here, we need not consider whether any error occurred because even if it did, it was harmless.[8]   As is evident from the jury's

[7]Dziemit claims to have objected below to the willful blindness instruction for common law fraud.  She is wrong.  The record demonstrates unambiguously that she did not object to this instruction at the charge conference or at any time after the instruction was given to the jury.  Indeed, the only issue as to the willful blindness instruction arose from whether it could be used to support liability under RICO, for which IFC advocated and which the district court rejected (an issue not raised on appeal). Indeed, Dziemit's trial counsel stated that he did not believe the instruction was proper for the RICO claim, but that it was appropriate for the common law fraud count because for "fraud -- there is language in cases, I think, that allows a lower standard, if you will, which is this willful blindness, where you may know something but you basically take the position, I don't want to know what it is that's going on."

[8]We note, however, that Massachusetts appears to support a willful blindness instruction in civil fraud suits.  The Massachusetts Superior Court Civil Practice Jury Instructions for intentional misrepresentation read:

> The defendant is liable if [he/she] made a false statement of fact, knowing it to be false.  Likewise, if the defendant made an unqualified statement about facts, the truth or falsity of which the defendant could have determined with certainty, and gave the plaintiff the reasonable impression that [he/she] was speaking of [his/her] own knowledge, then the defendant is not excused from liability if [he/she] did not in fact know whether that statement was true or false. The law regards such willful disregard of the facts as equivalent to an intentional misrepresentation.  Actual intent to deceive need not be proven.

-22-

determination that Dziemit was liable for violating RICO, it found that Dziemit actually knew that she engaged in mail and/or wire fraud. The jury, then, did not need to rely on the willful blindness instruction to reach its verdict on the fraud claim; its finding of liability would have been the same even without the instruction.

**B. IFC's Cross-Appeal in Relation to its Chapter 93A Claim**

On its cross-appeal, IFC argues that the district court erred in denying its motion for entry of judgment against Dziemit on its Chapter 93A claim. It seeks a remand to the district court to make findings, or a ruling from this court on the merits.

During oral argument, this court asked counsel for IFC whether it wished to pursue its Chapter 93A claim in the event that the court upheld the jury verdict against Dziemit. Although counsel indicated during argument that it would still seek the claim's resolution, it reversed its position in a letter subsequently mailed to the court. In view of IFC's stance, because we affirm the judgment against Dziemit based on the jury verdict, we decline to address its Chapter 93A claim.

---

Mass. Super. Ct. Civil Practice Jury Instr. § 20.1.4; see also, e.g., Kozdras, 413 N.E.2d at 1111 ("'[I]f a statement of fact which is susceptible of actual knowledge is made as of one's own knowledge and is false, it may be the basis for an action of deceit without proof of an actual intent to deceive.'" (quoting Pietrazak v. McDermott, 167 N.E.2d 166, 168 (Mass. 1960)).

## C.  Dziemit's Appeal in Relation to the Appeal Bond

Federal Rule of Appellate Procedure 7 states, "In a civil case, the district court may require an appellant to file a bond or provide other security in any form and amount necessary to ensure payment of costs on appeal." Fed. R. App. P. 7.  IFC moved in the district court for such a bond after Dziemit filed her notice of appeal, asking that Dziemit be required to post $30,000 to cover $5000 of IFC's anticipated expenses and $25,000 of its appellate attorneys' fees.  IFC argued that the inclusion of attorneys' fees in a Rule 7 bond is proper when the statute underlying the litigation contains a fee-shifting provision that includes attorneys' fees as part of costs awardable, as RICO does.  The district court granted IFC's motion and ordered Dziemit to post an appeal bond of $10,000 within fifteen days.  In doing so, it did not adopt IFC's reasoning and instead held that because Dziemit's appeal bore "the indicia of frivolousness," the bond could include fees as part of the costs on appeal.

Dziemit appealed the district court order and did not post the bond by the deadline.  Thereafter, the parties filed several motions, both in district court and in this court, related to the bond.  Dziemit sought to stay the bond, IFC sought to dismiss Dziemit's appeals for her failure to post the bond, IFC sought to stay the merits appeals pending resolution of the bond appeal, and IFC moved for a briefing extension in view of the

appeal bond issue.  This court issued an order on November 17, 2009, denying Dziemit's motion to stay the bond and IFC's motions to stay or dismiss the appeals.  We granted IFC's motion for a briefing extension and directed the parties to address the circuit split concerning the inclusion of attorneys' fees in an appeal bond.

We review for abuse of discretion a district court's imposition of an appeal bond, including its view that an appeal is frivolous.  Sckolnick v. Harlow, 820 F.2d 13, 15 (1st Cir. 1987).  Whether attorneys' fees may be part of the "costs on appeal" under Rule 7, however, presents a question of law accorded de novo review.  See Riva v. Ficco, 615 F.3d 35, 40 (1st Cir. 2010); Adsani v. Miller, 139 F.3d 67, 71 (2d Cir. 1998).

In accounting for attorneys' fees in the appeal bond, the district court relied on our opinion in Sckolnick v. Harlow, 820 F.2d 13.  There, we found a district court did not abuse its discretion by including fees in a bond because it concluded impliedly that "the appeal might be frivolous and . . . an award of sanctions against plaintiff on appeal was a real possibility." Id. at 15.  Here, however, we need not evaluate the district court's finding of frivolity because we affirm the issuance of the bond on an alternative ground.  See P.R. Ports Auth. v. Umpierre-Solares, 456 F.3d 220, 224 (1st Cir. 2006) ("We may affirm a district court decision on any ground supported by the record.").  In doing so, we

-25-

endorse the majority view that a Rule 7 bond may include appellate attorneys' fees if the applicable statute underlying the litigation contains a fee-shifting provision that accounts for such fees in its definition of recoverable costs and the appellee is eligible to recover them.  See Azizian v. Federated Dep't Stores, Inc., 499 F.3d 950 (9th Cir. 2007); In re Cardizem CD Antitrust Litig., 391 F.3d 812 (6th Cir. 2004); Pedraza v. United Guar. Corp., 313 F.3d 1323 (11th Cir. 2002); Adsani, 139 F.3d 67.

As the Second, Sixth, Ninth, and Eleventh Circuits have found, there are several reasons to support our holding.  First, Rule 7 does not define the term "costs on appeal."  Although the American rule establishes that each party to a litigation is responsible for paying its own attorneys' fees, several statutes enacted prior to both the 1968 adoption of the Federal Rules of Appellate Procedure and the 1979 amendment to Rule 7 contain exceptions to the American rule and define costs recoverable to include fees.[9]  See Marek v. Chesny, 473 U.S. 1, 7-8 (1985). Courts understand these fee-shifting statutes to account for appellate fees as well.  Azizian, 499 F.3d at 958; see also Farmington Dowel Prods. Co. v. Forster Mfg. Co., 421 F.2d 61, 91 & n.2 (1st Cir. 1970) (noting that Clayton Act, which includes fee-

---

[9]At the adoption of the Rules, Rule 7 required an appellant to file a bond in the fixed amount of $250.  An amendment in 1979 eliminated the requirement and left the bond issuance and amount to the discretion of the district court.  See Fed. R. App. P. 7 advisory committee's note (1979).

shifting provision comparable to RICO, allows a plaintiff to recover appellate fees if he sustains on appeal a district court judgment of a violation). It is presumed that the Rule drafters were aware of these statutes and understood "costs" under Rule 7 to provide for these fees when applicable. See Adsani, 139 F.3d at 73; see also Marek, 473 U.S. at 8-9.

Supreme Court precedent supports this view. In Marek v. Chesney, 473 U.S. 1, the Court interpreted "costs" as stated in Federal Rule of Civil Procedure 68[10] to encompass attorneys' fees when a fee-shifting statute included the fees as part of the recoverable costs. It explained:

> [G]iven the importance of "costs" to the Rule, it is very unlikely that this omission [of a definition of "costs"] was mere oversight; on the contrary, the most reasonable inference is that the term "costs" in Rule 68 was intended to refer to all costs properly awardable under the relevant substantive statute or other authority.

Id. at 9.

Second, our holding is not contrary to Federal Rule of Appellate Procedure 39. Rule 39, entitled "Costs" establishes: (a) against whom costs may be assessed, (b) the

---

[10]Rule 68 controls offers of judgment. For offers not accepted, "If the judgment that the offeree finally obtains is not more favorable than the unaccepted offer, the offeree must pay the costs incurred after the offer was made." Fed. R. Civ. P. 68(d) (2010). In Marek, the Court found that these "costs" include attorneys' fees when the relevant statute underlying the litigation defined awardable costs as both costs and fees. 473 U.S at 8-9.

circumstances under which costs may be assessed for or against the United States, (c) costs for brief and appendix copies, (d) the procedure for claiming costs, and (e) costs on appeal that are taxable in the district court. Dziemit argues that the list of taxable costs in subdivision (e), which does not include attorneys' fees,[11] defines "costs" for Rule 7 purposes and limits the universe of costs that may be awarded on appeal. We are unconvinced. No part of Rule 39 purports to define costs; each concerns only the procedures for taxing them. Adsani, 139 F.3d at 74. Further, the Rule does not limit "costs on appeal" under Rule 7. The advisory committee's note at the adoption of the Rules explains that "[t]he costs described in [Rule 39(e)] are costs of the appeal and, as such, are within the undertaking of the appeal bond." Fed. R. App. P. 39(e) advisory committee's note (1967) (emphasis added). We understand this to mean that the costs delineated in Rule 39(e)

---

[11]Rule 39(e) reads:

> The following costs on appeal are taxable in the district court for the benefit of the party entitled to costs under this rule:
>
> (1) the preparation and transmission of the record;
> (2) the reporter's transcript, if needed to determine the appeal;
> (3) premiums paid for a supersedeas bond or other bond to preserve rights pending appeal; and
> (4) the fee for filing the notice of appeal.

"are among, but not necessarily the only, costs available on appeal" or for a bond.  <u>Azizian</u>, 499 F.3d at 958.[12]

Third, although two cases, one from the D.C. Circuit and one from the Third Circuit, have found Rule 39(e) to restrict the costs calculable for Rule 7 purposes, the cases presented distinguishable circumstances since neither involved a fee-shifting statute.  <u>Adsani</u>, 139 F.3d at 73-74; <u>see</u> <u>In re Am. Presidential Lines, Inc.</u>, 779 F.2d 714 (D.C. Cir. 1985); <u>Hirschensohn</u>, 1997 U.S. App. LEXIS 13793, at *7 (finding Virgin Island statute did not provide for appellate attorneys' fees).  Moreover, the D.C. Circuit has since concluded that Rule 39 "costs" taxable in the district court <u>do</u> include appellate attorneys' fees when the statute underlying the appeal allows the recovery of the fees as part of costs.  See <u>Montgomery & Assocs., Inc.</u> v. <u>Commodity Futures Trading Comm'n</u>, 816 F.2d 783, 784 (D.C. Cir. 1987).

Applied here, we find no error of law in the inclusion of attorneys' fees for Dziemit's Rule 7 bond.  Under the RICO statute, "Any person injured in his business or property by reason

---

[12]We acknowledge that earlier editions of some treatises stated that attorneys' fees were outside the scope of a Rule 7 bond.  <u>See</u> <u>Hirschensohn</u> v. <u>Lawyers Title Ins. Corp.</u>, No. 96-7312, 1997 U.S. App. LEXIS 13793, at *6 (3d Cir. June 10, 1997) (unpublished) (citing 20 James Wm. Moore, et al., <u>Moore's Federal Practice</u>, § 339.41 (3d ed. 1997); 16A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice & Procedure</u> § 3953 (2d ed. 1996)). More recent editions, however, merely acknowledge the circuit split without endorsing a position.  <u>See</u>, <u>e.g.</u>, 16A Charles Alan Wright et al., <u>Federal Practice & Procedure</u> § 3953 (4th ed. 2008).

of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee" (emphasis added). 18 U.S.C. § 1964(c). We assume for present purposes that appellate fees are part of the fees calculable as costs under RICO; Dziemit does not argue that this is not so, thereby waiving the argument, neither party has briefed the issue, and we have found no authority to counter our assumption. IFC proved below a RICO injury and defends the finding on appeal. We therefore see no reason why Dziemit's appeal bond may not include IFC's anticipated appellate fees.

Dziemit argues that to allow for the inclusion of attorneys' fees in appeal bonds will chill unsuccessful litigants from pursuing their right to appeal district court decisions. This reasoning is unpersuasive. Any bond imposed pursuant to Rule 7 burdens an appeal to some degree, yet we presume that Rule 7 is valid. See Adsani, 139 F.3d at 76. To the extent that a bond may impermissibly burden an appeal, a litigant can move us to stay the bond or to reduce its amount. Here, we are satisfied that Dziemit's rights were not hampered. Although she submitted in her motion to stay the bond that she was in poor financial shape, we found that she did not demonstrate any prospect of irreparable harm and she vowed to post the bond were her motion denied, which she did.

### III. Conclusion

For the reasons stated herein, we **affirm** the district court's judgment based on the jury verdict entered against Dziemit, **dismiss** IFC's cross-appeal related to its Chapter 93A claim, and **affirm** the district court's order imposing an appeal bond in the amount of $10,000.

Costs are awarded to IFC. We remand this matter to the district court for a determination as to the awarding of appellate attorneys' fees.

**So ordered**.